PHILLIP A. TALBERT
United States Attorney
KAREN A. ESCOBAR
Assistant United States Attorney
2500 Tulare Street, Suite 4401
Fresno, CA 93721
Telephone: (559) 497-4000

KRISTEN CLARKE
Assistant Attorney General
FARA GOLD
Special Litigation Counsel/Senior Sex Crimes Counsel
Civil Rights Division, Criminal Section
U.S. Department of Justice
Telephone: (202) 514-3847

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>            v.<br><br>J. DESHAWN TORRENCE,<br><br>                    Defendant. | CASE NO. 1:22-CR-207 JLT<br><br>UNITED STATES MEMORANDUM AND PROFFER IN SUPPORT OF PRETRIAL DETENTION<br><br>DATE: August 10, 2022<br>TIME: 2:00 p.m.<br>COURT: Hon. Erica P. Grosjean |

**UNITED STATES MEMORANDUM AND PROFFER IN SUPPORT OF PRETRIAL DETENTION**

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................1

II.     BACKGROUND ................................................................................................2

III.    FACTUAL PROFFER OF THE EVIDENCE SUPPORTING THE CHARGES ..........................3

        A.      The Initiation of the Federal Investigation ................................................3

        B.      The Victims in the Indictment ................................................................4

                1.      **M.C.G. (Counts One, Two, Three, and Four)** ................................4

                2.      **L.S. (Count Five)** ................................................................7

                3.      **S.L. (Counts Six, Seven, and Eight)** ................................9

                4.      **B.H. (Counts Nine and Ten)** ................................................13

IV.     LEGAL ANALYSIS ................................................................................15

        A.      Factors Governing Detention ................................................................16

                1.      **Nature and Circumstances of the Offenses Charged** ................16

                2.      **The Weight of the Evidence Against the Defendant** ................17

                3.      **The History and Characteristics of the Defendant** ................19

                4.      **The Nature and Seriousness of the Danger to Any Person or the Community** ................................................................20

        B.      The Defendant's Risk of Flight ................................................................20

V.      CONCLUSION ................................................................................21

# TABLE OF AUTHORITIES

Page(s)

Cases

*Doe ex rel. Rudy-Glanzer v. Glanzer*,
   232 F.3d 1258 (9th Cir. 2000) .................................................................................. 17
*United States v. Cabrera-Ortigoza*,
   196 F.R.D. 571 (S.D. Cal. 2000) ................................................................................ 2
*United States v. Crow Eagle*,
   705 F.3d 325 (8th Cir. 2013) ..................................................................................... 17
*United States v. Enjady*,
   134 F.3d 1427 (10th Cir.1998) ................................................................................... 17
*United States v. Gebro*,
   948 F.2d 1118 (9th Cir. 1991) ............................................................................. 15, 16
*United States v. Guardia*,
   135 F.3d 1326 (10th Cir. 1998) ................................................................................. 17
*United States v. LeCompte*,
   131 F.3d 767 (8th Cir. 1997) ..................................................................................... 17
*United States v. Meacham*,
   115 F.3d 1488 (10th Cir. 1997) ................................................................................. 17
*United States v. Meling*,
   47 F.3d 1546 (9th Cir. 1995) ..................................................................................... 17
*United States v. Motamedi*,
   767 F.2d 1403 (9th Cir. 1985) ................................................................................... 20
*United States v. Redlightning*,
   624 F.3d 1090 (9th Cir. 2010) ................................................................................... 17
*United States v. Townsend*,
   897 F.2d 989 (9th Cir. 1990) ..................................................................................... 16
*United States v. Van Metre*,
   150 F. 3d 339 (4th Cir. 1998) .................................................................................... 17
*United States v. Winsor*,
   785 F.2d 755 (9th Cir. 1996) ....................................................................................... 2

Statutes

18 U.S.C. § 242 ................................................................................................................ 2
18 U.S.C. § 3142(f) ....................................................................................................... 15
18 U.S.C. § 3142(f)(1)(A) ............................................................................................ 15
18 U.S.C. § 3142(f)(A) ................................................................................................... 2
18 U.S.C. § 3142(g) ................................................................................................. 15, 20
18 U.S.C. §§ 3142(a)(4) ................................................................................................. 1
19 U.S.C. § 3142(f) ......................................................................................................... 2

Rules

Fed. R. Evid. 404(b)............................................................................................................17

Fed. R. of Evid. 413...........................................................................................................17

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

2   PHILLIP A. TALBERT
    United States Attorney
3   KAREN A. ESCOBAR
    Assistant United States Attorney
    2500 Tulare Street, Suite 4401
4   Fresno, CA 93721
    Telephone:  (559) 497-4000
5
    KRISTEN CLARKE
6   Assistant Attorney General
    FARA GOLD
7   Special Litigation Counsel/Senior Sex Crimes Counsel
    Civil Rights Division, Criminal Section
8   U.S. Department of Justice
    Telephone: (202) 514-3847
9

10  Attorneys for Plaintiff
    United States of America
11

12              IN THE UNITED STATES DISTRICT COURT

13              EASTERN DISTRICT OF CALIFORNIA

14

15  UNITED STATES OF AMERICA,          CASE NO.  1:22-CR-207 JLT

16                    Plaintiff,       UNITED STATES MEMORANDUM AND
                                       PROFFER IN SUPPORT OF PRETRIAL
16          v.                         DETENTION

17
    J. DESHAWN TORRENCE,               DATE: August 10, 2022
18                                     TIME: 2:00 p.m.
                      Defendant.       COURT: Hon. Erica P. Grosjean
19

20

21                 I.        **<u>INTRODUCTION</u>**

22          The United States of America, through its attorneys, has respectfully moved this Court to issue

23  an Order detaining J. DESHAWN TORRENCE pending trial, pursuant to 18 U.S.C. §§ 3142(a)(4),

24  3142(f)(1)(A) and (B), and 3142(g).  The defendant, a former police officer with the Sanger Police

25  Department, is charged with multiple crimes of violence and he faces life in prison for several of the

26  sexual assaults he committed during the course of his duties as a law enforcement officer.  Detention is

27  necessary because there is no condition or combination of conditions that will reasonably assure the

28  appearance of the defendant and the safety of the community.

As set forth in this memorandum, there is clear and convincing evidence that the defendant engaged in a pattern of sexual assault throughout his employ at the Sanger Police Department. He preyed on the vulnerabilities of the women he encountered, be they victims of domestic violence, employees of the convenience store he frequented while on duty, or individuals suspected of driving under the influence. He terrorized many of them for months on end, threatening to arrest loved ones or otherwise making them live in fear of him, and sexually assaulting without consequence. The defendant was tasked with upholding the Constitution and keeping the City of Sanger safe. Instead he violated his oath and the victims' constitutional rights with impunity, and he rendered the streets he patrolled unsafe due his own predatory conduct. The United States therefore seeks to detain the defendant pending trial.

## II.    BACKGROUND

On July 28, 2022, the Grand Jury returned an indictment under seal charging the defendant with ten counts of violating 18 U.S.C. § 242, Deprivation of Rights Under Color of Law, for willfully depriving four different women, whom he encountered in his capacity as a police officer, of their Constitutional right to bodily integrity by sexually assaulting them. Four of the counts charge that the defendant's conduct included either aggravated sexual abuse or attempted aggravated sexual abuse, and therefore each of those counts carries a maximum penalty of up to life in prison. Another count charges that the defendant's conduct resulted in bodily injury and that count carries a maximum penalty of 10 years in prison. [1] The five remaining counts each carry a maximum of one year in prison.[2]

On Friday, August 5, 2022, after the indictment was unsealed and when the defendant was

---

[1] Count One also charges that the defendant conducted resulted in bodily injury, but it also charges that the conduct included aggravated sexual abuse.

[2] As described below, two of the misdemeanor counts charge the defendant with directing the victim to remove her clothes without a legitimate law enforcement purpose. Two other misdemeanor counts charge the defendant with making the victim touch his penis in one count, and putting his mouth on her breast in the other count, all without her consent. The fifth misdemeanor count charges the defendant with coercing the victim to perform oral sex on one or more occasions. Although these are all misdemeanors because the evidence does not establish any of the statutory enhancements set out in 18 U.S.C. § 242, it should be noted that Congress recently rectified the penalty structure for civil rights offenses involving sexual misconduct, when it enacted 18 U.S.C. § 250 as part of the 2022 Reauthorization of the Violence Against Women Act. Although inapplicable here because the statute goes into effect on October 1, 2022, it is nonetheless instructive as to the gravity of the crimes charged to note what the penalties would otherwise be as of October 1, i.e. the count charging coerced oral sex would be punishable up to life in prison, and the two counts involving unwanted touching would each be punishable up to 10 years in prison.

arraigned, the United States moved that the defendant be detained, pursuant to 18 U.S.C. § 3142(f)(A) and (B). The defendant is charged with multiple crimes of violence, particularly where the aggravated sexual abuse and attempted aggravated sexual abuse enhancements are alleged, and he faces life in prison on those four counts. There is no condition or combination of conditions to reasonably assure the safety of any person or the community, and there this Court can and should continue to detain the defendant pending trial.

## III.   FACTUAL PROFFER OF THE EVIDENCE SUPPORTING THE CHARGES

At a detention hearing, the United States may present evidence by way of a proffer. 19 U.S.C. § 3142(f); *United States v. Winsor*, 785 F.2d 755, 756 (9th Cir. 1996); *United States v. Cabrera-Ortigoza*, 196 F.R.D. 571, 574 (S.D. Cal. 2000). The United States therefore proffers the following evidence as set forth below and throughout this memorandum.

### A.   The Initiation of the Federal Investigation

The defendant's sexual misconduct came to light because, as detailed below, in June 2021, a woman (listed as B.H. in Counts Nine and Ten in the Indictment) whom the defendant detained for suspicion of driving under the influence reported that he forced her to touch his penis, and then put his mouth on her breasts without her consent.  The Sanger Police Department (SPD) referred the matter to the Fresno County Sheriff's Office (FSO) for investigation, and soon thereafter, FSO arrested the defendant. In so doing, via a news conference, FSO encouraged anyone with additional information to come forward.  As a result, additional victims felt safe to come forward, hoping that they might finally be believed, fearing in the past that no one would take their word over that of a law enforcement officer. Because several of the sexual assaults that these "new" victims alleged occurred outside of California's statute of limitations, the state authorities deferred to federal authorities and the investigation continued.

The indictment charges the defendant with the sexual assaults of three women in addition to his sexual assaults of B.H.  Nonetheless, the federal investigation remains ongoing because the United States is aware of several additional allegations that the defendant committed various forms of sexual assault in his capacity as a police officer and at least one sexual assault that he committed in his personal capacity.

For each victim listed in the indictment, the United States developed evidence that each woman

reported her sexual assaults to family, friends, an attorney – and in one case, SPD itself – well before FSO ever held its June 2021 news conference, and close in time to when the defendant's misconduct occurred. These "early disclosures" are admissible at trial pursuant to Fed. Rule. Evid. 801(d)(1)(B) to rebut a defense of recent fabrication or improper motive. They corroborate the victim' accounts, and they foreclose any defense that these women simply "jumped on the bandwagon" when FSO announced the defendant's arrest. Moreover, these victims gain nothing by coming forward other than to see their perpetrator held to account.

As set forth below, the victims' accounts that corroborate one another, their early disclosures, and the fact that each victim neither knew each other at the time they were assaulted nor at the time the defendant's misconduct came to light, establish that there is little doubt (and certainly no reasonable doubt) of the defendant's guilt. In fact, defendant's overwhelming guilt and his danger to the community are illustrated by his number of victims and pattern of conduct.

### B. The Victims in the Indictment

The evidence that forms the basis of the indictment is listed below in chronological order, with the oldest assault first, consistent with how the counts are listed in the indictment. The most recent allegation, listed last, is what prompted the federal investigation, as noted above.

#### 1. M.C.G. (Counts One, Two, Three, and Four)

The defendant first sexually assaulted M.C.G., now 71-years old, in the late summer or fall of 2017, but fearing she would not be believed, she did not report him to SPD, as the defendant was an SPD officer himself. She did, however, immediately after he first raped her, contact an attorney she knew, hoping to see what recourse she might have. That attorney, through a paralegal, told her that he could not prove the allegations. Indeed, that attorney declined to meet with M.C.G., and he sent an email to that paralegal in 2017 in which he (jokingly) wrote "There is no way I'm going to be able to prove this case...but makes for a great scene in an erotic movie! LOL."[3]

As a result, M.C.G. did not tell anyone else about the repeated sexual assaults that the defendant

---

[3] This one sentence is illustrative of what the defendant banked on to get away with his crimes, and it is illustrative of why sexual assault victims – and these victims in particular – were reluctant to come forward, thinking they would not be believed.

made her endure, and she ultimately moved from Sanger.  That changed in April 2022, during a visit to Sanger, when she learned about the defendant's aforementioned arrest by the FSO. That prompted M.C.G. to muster the courage to call SPD and report the defendant's misconduct that had begun almost five years earlier.  In so reporting, M.C.G.'s first concern was to confirm that the defendant no longer worked at SPD. When the SPD officer to whom she was speaking confirmed that, she hesitated and then flatly stated, "He raped me."

M.C.G. explained that she first encountered the defendant while sitting in her car, outside of her house.  She had driven home after having a few drinks.  She parked across the street from her house, and, as she explained, she was listening to music and fell asleep.  She woke up to the defendant knocking on her window, and telling her that he was going to arrest her for driving under the influence. She told him that she lived across the street. He then took her license and walked away.  Upon returning, he told her that he would not arrest her but that he would walk her to her house.

As he did so, he asked if she was wearing "panties" under her long dress.  She thought it was weird that he could tell that she was not, but she answered truthfully.  When they arrived at the gate to her property, she told him that he could leave.  He insisted on accompanying her into her residence, and followed her inside.  The defendant began looking around the house and went toward the kitchen, which was being renovated at the time and was full of tools and building materials.  In an effort to get him to leave, M.C.G. thanked the defendant. But instead of leaving, he grabbed her shoulders, forcing her into the kitchen, and toward the stove, which was still in a box.

At that point, she froze because she knew the defendant was going to rape her.  He then pushed her into the stove box, lifted the back of her dress, and forcefully penetrated her vagina with his penis. She described feeling vaginal pain because she had not had sex in some time.  After a few thrusts, he then turned her around, pushed her down from her shoulders to a squatting position, and then told her to, "Suck it."  She told him that she "[does] not do oral sex," but the defendant angrily told her to "just suck it."  Fearing for her physical safety and aware that he was an officer with a gun, she complied.  M.C.G. gagged until he ejaculated.  At that point, he got angry that she might spit out his semen, and ordered her to swallow it, telling her that that he did not want there to be any evidence.  As he was about to leave, he told M.C.G, "For an old bitch you got a really nice young body."  He then told her that he would keep in

touch.  And he did.

For almost two and a half years until about January 2020, the defendant would park on her corner at random, as if to let her know he was there, a common intimidation tactic that he would employ with many of his victims.  He would call her phone, and sporadically show up at her house when he knew that neither her son nor her eventual husband was home.  He would demand that she perform oral sex, threatening to arrest her or her son for any reason of his choosing.  Sometimes weeks would go by and she thought she was safe, but he would show up again. As she succinctly explained, the defendant used his power to intimidate her into submission–and she was scared to death of him.

The defendant stopped sexually assaulting M.C.G. because in January 2020, she lied and told him that she and her husband were going to a fundraiser for the Fresno Police Chief, claiming that her husband was friends with him.  That seemed to scare him off, and he stopped bothering her (and sexually assaulting her) until about a year later in January 2021.

In the interim, M.C.G. had moved out of her house and into an apartment due to her husband's illness.  He died on January 10, 2021, and M.C.G. would often drive by her old house that held fond memories.  On one occasion shortly after her husband's death, the defendant saw her in her car and knocked on the window, commenting that he had not seen her in a while.  Scared, she told him that she had to leave. But he reached through the window and into her shirt, and twisted and pinched her left nipple through her bra, resulting in a burning sensation, a practice articulated by another victim not listed in the indictment, and whose allegations are still being investigated.  Humiliated, M.C.G. moved from Sanger after that interaction.

M.C.G. saved the defendant's phone number in her phone as "officer" to this day – and it was the same number that he used in 2021 to text B.H., the victim listed in Counts Nine and Ten and the same number he used in 2018 to repeatedly call S.L., the victim listed in Counts Six, Seven, and Eight in the indictment.

When federal authorities told M.C.G that they would be in touch once a decision was made about whether the defendant would be charged, M.C.G. said that she was just relieved to tell what happened and to be believed.

2. **L.S. (Count Five)**

The defendant sexually assaulted L.S. in her home during October or November 2017, but he continued to terrorize her thereafter. FSO and federal authorities only learned about L.S. because her mother saw on the news that the defendant was arrested and called FSO to report what her daughter disclosed to her years earlier. L.S.'s mother was an SPD employee herself and saw the defendant from time to time. She always wanted L.S. to formally report the defendant, but L.S. was terrified of him, and she did not think anyone would believe her if she reported him. L.S. remained reluctant to speak with FSO and FBI agents, but she ultimately did so.

L.S. met the defendant in the fall 2017 (as it turns out, not long after he first raped M.C.G.), when she worked the night shift at Fastrip, a convenience store that he frequented while on duty. One of the customers had been harassing her, so she asked the defendant for assistance. He responded something to the effect of, "Well since I'm going to help you, you need to do me a favor." L.S. immediately thought his response was sexual and she refused, telling him that it would be inappropriate and referenced his wedding band and the fact that he was married. But he told her that he did not mean anything sexual and instead said that he wanted a home-cooked meal as a show of gratitude. She thought that was odd, but agreed to cook for him, in exchange for his help.

Two nights after the discussion about cooking for him, L.S. brought food to work to give to him. When she offered it to the defendant, he said he would come by again during a break, but he never did. Yet around 2:30 a.m., after L.S.'s shift was over and she was in bed, the defendant arrived in uniform at her apartment. She was surprised because she never told the defendant where she lived. Despite the hour, she assumed he came to pick up his food. She told him to wait at the door while she went to get the food, leaving the front door open and the screen door closed. Instead of waiting, the defendant came inside and unbeknownst to L.S., snuck up behind her in the kitchen.

He cornered her against the kitchen counter by pressing his body and police utility belt against her body, effectively sandwiching her. She froze, but then he attempted to kiss her and she began struggling to get him off of her. He was stronger than her and would not stop. He ran his hand up her shorts, touching her bare buttocks. He then put his hand in her tank top, attempting to cup her breasts and, ultimately, touching the side of her bare breasts. L.S. described it as a struggle where she would try

to get him off of her, but he was too aggressive and too strong for her to successfully resist.

Attempting to get him to stop, L.S. kept telling him that her daughter was asleep in the other room. That prompted the defendant to walk away from her to close the door that led into her daughter's room. When he did so, L.S. rushed to the front door, and when the defendant returned, she forced him out the door, almost like she was shooing him away. He then left the residence as if nothing had occurred.

L.S. explained that she was particularly terrified because he knew that she had been driving without a license, that he somehow knew where she lived, and that he knew she was a single mother. She was afraid that he would keep showing up at her house, take her car, and create problems at her job at Fastrip. As she succinctly put it, "There's a million things he could do to me as a cop."

Her fears were warranted because thereafter, the defendant began a pattern of stalker-like behavior, during which he taunted her. He constantly showed up at Fastrip while she was working. She tried to avoid him, but he would nonetheless come up to her register. During one encounter, she was nervously twirling a rubber band. He told her that if the rubber band hit his eye, he would have every right to shoot her in the face and kill her because a rubber band is a deadly weapon. There were also other occasions where he would idle in her parking lot or conduct traffic stops on her for seemingly no reason, telling her that he could take her to jail "right now."

In addition to being terrified of him, L.S. explained that she felt fooled by the defendant because he was nice and helpful when she first met him, which is ironically why she agreed to cook for him in the first instance. But as a result of her interactions with the defendant, she no longer feels safe in her own town. Prior to meeting with FSO and the FBI, as a result of the defendant assaulting her, she had not called the police, even when she needed help.

In addition to disclosing the conduct to her mother about a month after the assault, L.S. also told her best friend, who wanted to report it on her behalf, but L.S. forbade her to do so. That friend corroborated L.S.'s disclosure and the friend herself witnessed the defendant show up at L.S.'s complex three times in one evening.

L.S. finally came forward at the encouragement of her mother and her sister-in-law. Her decision was in large part because she believed there had been other victims, remembering that she

thought the defendant was so calm during her assault that it felt like it was practiced.

3. **S.L**. **(Counts Six, Seven, and Eight)**

On February 28, 2018, S.L. was the victim of a domestic violence allegation, for which the defendant was the responding officer. In the ten days that followed, he used his authority as a police officer to make her undress under the guise of photographing her injuries, and then he sexually assaulted her in her home.

At the encouragement of her friend, a deputy district attorney in a neighboring county, S.L. reported the defendant within weeks of his misconduct, and an SPD internal affairs investigation ensued. Although as a result of that investigation, the defendant was found to have taken gratuitous photos – and to not have properly preserved those as evidence – the rest of his misconduct was deemed "unsubstantiated," simply because the investigator refused to rely on the word of a victim, something investigators do all the time for every other type of crime – and exactly what jurors are instructed they are permitted to do when considering whether a defendant's guilt. Ironically, and arguably in contravention of his own finding, the internal affairs investigator noted that the defendant had an alarmingly high rate of phone calls to S.L. and found that they tended to bolster her credibility. Significantly, after the investigation, SPD supervisors were told to keep an eye on the defendant, even though the defendant was permitted to remain on patrol at SPD.

In addition to reporting the defendant to internal affairs, S.L took contemporaneous notes of the defendant's misconduct, and also disclosed to her sister what the defendant was doing to her, both in conversation and via text message.

When the defendant responded to the domestic violence call in February 2018, he had been familiar with S.L because he had responded to a prior domestic call to S.L.'s home at a prior address. S.L. did not remember that the defendant had responded to that call until he referenced it in an effort to remind her that her husband's goal was to make her look crazy. In that prior incident, S.L.'s husband tied her to the bed and raped her. Instead of just arresting her husband, the defendant gave the couple an option: either her husband goes to jail or S.L gets "5150-ed," a euphemism for California's involuntarily hospitalization statute. S.L. chose the latter, essentially martyring herself to save her husband. The defendant was therefore well aware of S.L.'s vulnerabilities, and he exploited them.

The defendant and two female SPD officers responded to the February 2018 report of domestic violence at S.L.'s residence that forms the basis of the charges in the indictment. The defendant conducted an interview of S.L. in her bedroom while the female officers interviewed S.L.'s husband in another room.  According to S.L., her husband had assaulted her and, consequently, she had a bruise on her thigh and scratches on her face and neck.

As captured on an audio recording taken during this interaction from his body worn camera, the defendant advised, contrary to policy, that he would take photographs of S.L.'s injuries, specifically telling one of the female SPD officers on scene, "They're not too intimate, so I'll take them."  He then took photos of S.L. in her bedroom closet.  One photo depicts S.L. with her leggings pulled down exposing her underwear.  The defendant also told her that she had a mark on her neck and, therefore, in order to photograph the mark, S.L. had to move her shirt down to the point where her breasts were partially exposed.  S.L. did not understand why he would need her to expose that much of her chest for a neck injury. There were no visible marks or injury to her chest.  Nonetheless, she complied because he was a police officer.

Later that night, the defendant showed up at S.L.'s house again with a copy of an emergency protective order, and he urged her to go to court to make it permanent.  She told him that she did not intend to do that, and as she later explained, she was the sole breadwinner, and she did not want to pay for her husband to live elsewhere.  The defendant then told her that he has become close to several women who have been in similar situations.  He said that if she shows the defendant that she is "serious," he will give her his cell phone number, so she does not have to call 911.  It should be noted that according to numerous SPD officers, they rarely, if ever, give out their personal cell phone to civilians.  The defendant then hugged S.L., telling her that he would be off for a few days but would check back in with her.

As promised, several days later, on March 5, 2018, the defendant again arrived at S.L.'s residence.  At the time, S.L. had a migraine and directed her daughter to ask the defendant to return later.  The defendant nonetheless insisted on speaking with S.L. He said he needed to investigate and search the residence to see if S.L.'s husband was there.  Contrary to policy, and without any legitimate law enforcement purpose, the defendant insisted he had to take additional photos of her injuries. S.L.

advised him that she did not have any marks on her chest, but he told her it was necessary. This time, given the type of shirt she was wearing, S.L. could not lower her shirt far enough for the pictures the defendant claimed he need to take. In response, he directed S.L. to remove her shirt, leaving on her bra. Because he was a police officer, S.L. complied. He then used a red digital camera that has since been seized from the defendant's locker, and appeared to take photographs of S.L.'s face, neck, stomach, chest and upper thighs with the camera.[4] As S.L. explained, the defendant's directives seemed obligatory and S.L. thought she had to comply, particularly because she did not want to hinder the domestic violence investigation. The next day, as corroborated by cell phone records, the defendant called S.L. multiple times, but she did not answer.

The day after that, on March 7, 2018, the defendant again showed up at S.L's house and again directed S.L. to her bedroom, where he told her to remove her dress in order to take additional pictures of her injuries. Again, the defendant reminded her he was a police officer, as though it was no big deal to remove her clothes in front of him, akin to a doctor performing a legitimate medical exam. Again. S.L. complied, standing in her bedroom in just her bra and underwear while the defendant appeared to photograph S.L.'s face, neck, stomach, chest and upper thighs. There was no legitimate purpose for any of the defendant's actions, and as multiple SPD officers explained, (1) officers only take additional photographs of injuries if a victim asks them to do so because the injuries have later become visible; (2) a male officer does not photograph sensitive areas of a female victim's body; (3) all of these interactions should have been captured on body worn camera, and (4) the defendant was well-versed in policies and procedures, so any claim that he did not know better does not have merit.

Later in the evening of March 7, 2018, the defendant again went to S.L.'s house. S.L. allowed him to come over, believing that he was still writing the police report associated with her husband's case. This time, the defendant made sexual comments, all in the context of telling her that she deserved better than her husband. He suggested that S.L. masturbate, describing in graphic detail how she should do so and telling her that her homework was to masturbate. He told her that he likewise would have the same homework and would think about her. The entire discussion made S.L. terribly uncomfortable,

---

[4] The camera is still being forensically examined for evidence of deleted photos. The fact that the defendant had a red digital camera in his locker nonetheless corroborates S.L.'s account.

and as noted above, as the defendant's behavior was escalating, S.L. was telling her friend, a deputy district attorney about the defendant. It was that friend who advised S.L. to take contemporaneous notes, and it was that friend who reported the defendant to SPD, leading to the aforementioned internal affairs investigation.

Prior to leaving S.L.'s house that night on March 7th, the defendant embraced S.L. without her initiation, lifting her up while doing so. He stated, "Man, I love me a married woman." Upon putting her down, S.L. attempted to pull away, but he responded, "Who said I was ready to let you go?" S.L. was disgusted.

The following day on March 8, 2018, as corroborated by phone records, the defendant called S.L at least four times that afternoon and evening, during which he continually told S.L. that he needed to stop by to take more photographs. "Like an idiot," as she explained, she felt like she had to allow him to come over because she understood that he was still in the process of writing her husband's domestic violence report and she feared the defendant would retaliate against her husband if she did not comply.

That night, the defendant again talked about masturbating and asked if S.L. had masturbated since their last discussion. He then went to S.L.'s bedroom, turn on the TV, and played YouTube instructional videos about how to masturbate. He then told S.L. that her husband had not made her feel "sexy" and, without asking for consent (and without a warrant), searched S.L.'s dresser drawers in search of lingerie. He found a red night gown and told S.L. to put it on. Scared of what the defendant might do if she did not comply, and not knowing how to get out of the situation, particularly without waking her sleeping children down the hall, S.L. went into the bathroom, got undressed, and put on the nightgown. Because the nightgown was too small and very revealing, she put on a robe to cover herself.

When S.L. emerged from the bathroom, the defendant removed her robe and placed his hands on her buttocks, and ran his hand down S.L.'s neck and cleavage, all without her consent. All the while, he made S.L. look at herself in the mirror, commenting about how she looked. She was scared and tried to leave her bedroom to get away from him, but he grabbed her by the hips and pulled her on to his lap where she felt his erect penis.

At that point, in addition to being scared, S.L. was angry, explaining that with all of the problems with her husband, she had constantly been treated like she was "crazy" and no one would take her

seriously.  Now, the defendant was seemingly doing the same thing.  S.L. then summoned her courage and directed him to leave, but he would not do so.  Thinking that the defendant was going to rape her if she did not try to escape, she ran from out a side door of her house and towards the gate of her property. The defendant chased after, grabbing her ahold of her by her vagina.  When S.L. reached the outside gate, where they were in full view of the neighborhood, after groping her again, the defendant turned and walked away toward his vehicle, as calmly as he left L.S.'s apartment the night that he attacked her.

S.L. has not spoken to the defendant since that final interaction, but he called her twice thereafter that night and she did not answer.  He called a few more times when he was back on duty a few days later. According to S.L, he then left a formal voicemail, checking to see how she was and leaving the phone number to the police department for her to reach him.

### 4.   **B.H.** (Counts Nine and Ten)

B.H. was sexually assaulted by the defendant on the evening of June 23, 2021, during a pretextual stop for driving under the influence.  She disclosed the assaults the next day to a friend who worked at SPD, who then alerted the police chief.

B.H. reluctantly reported the defendant because, as she explained, she has high regard for law enforcement, as her brother is a police officer and a firefighter, and she knows a lot of SPD officers. She ultimately did so because she knew that the defendant had a reputation for being inappropriate with women and, in particular, he has been stalking her friend, K.P., for some time.  The first and only time B.H. had encountered the defendant was two years prior during the summer of 2019. She and K.P. were walking around K.P.'s neighborhood, and the defendant pulled up and blocked them with his patrol vehicle. They were generally nice to him, but decided his flirty attitude was creepy.  At the time, they "let it go" because they know most of the officers in Sanger, and they were not concerned about him.

B.H. did not have another interaction with the defendant in the two intervening years, but she knew about him because K.P often saw him in the context of her job at the Chamber of Commerce. As K.P corroborated, the defendant often asked K.P. for hugs, sent her text messages, and generally made her uncomfortable.

Around 9:30 p.m. on June 23, 2021, the defendant, while acting in his capacity as an SPD officer, approached B.H.'s parked vehicle.  Because of his "stalking-like" behavior with K.P., B.H. was

1  uncomfortable when the defendant then asked her to exit her car.  Nonetheless, she complied because

2  she thought that he was investigating her for driving under the influence.  She had been drinking alcohol

3  earlier that night.

4       After B.H. exited her car, the defendant had her walk to his patrol vehicle about a block away, at

5  which point he asked if she was wearing a bra.  B.H. told him that she was not, and he proceeded to

6  move her shirt in such a way that exposed her breast without her consent.  He then asked B.H. if she

7  wanted to get in the back of his police vehicle with him. B.H. declined, thinking that the request was

8  sexual in nature.

9       The defendant then inquired as to the whereabouts K.P.   B.H. told him that K.P. likewise was

10  sobering up in her own car.  He said he would go look for K.P. As a result, B.H. was torn as to whether

11  she should follow the defendant to ensure K.P.'s safety or go back to her own car.  She chose the latter

12  and asked the defendant for permission to leave.  He granted it, but as B.H. began to walk back to her

13  vehicle, she could "feel him" following behind her.  When they approached a point where they were

14  somewhat hidden by bushes, he stopped B.H., and turned her around. He then grabbed B.H.'s hand and

15  forced her to stroke his exposed penis. B.H. retracted her hand in fear and disgust and began walking

16  away.

17       Immediately thereafter, K.P.'s car pulled up to a nearby stop sign.  According to K.P., the

18  defendant approached, stuck his head in her window, and asked what she was doing and why her shirt

19  was undone. K.P. was taken aback by his question because she was wearing a shirt that neither had

20  buttons nor was "undone."

21       B.H., concerned for K.P.'s safety, and despite the defendant telling her to stay where she was,

22  approached K.P.'s vehicle and stood next to the defendant.  In an ill-fated attempt to try to distract him

23  away from K.P. so that K.P. could drive away, B.H. turned toward him and squeezed her arms together

24  so that her breasts would appear to press together. But rather than just look at B.H., according to both

25  K.P. and B.H., the defendant flicked B.H.'s shirt open and sucked on her breast without her consent.

26       Shaking and in tears, B.H. went back to her car, but the defendant followed her. Using her first

27  name, he demanded that B.H. come over to him and give him her phone number.  She complied, though

28  she gave him a fake phone number.  When he asked her to repeat it, she could not remember the fake

number and begrudgingly provided her real phone number, written in the defendant's notebook that was subsequently seized by law enforcement.

The defendant then insisted on following B.H. home, which immediately terrified her. She thought the defendant would pull B.H. over and rape her.  Therefore, B.H. told him that she would remain in the area and park in a parking lot until she was sober. Ultimately, B.H waited until she was certain the defendant had left the area before driving home.

During that wait, the defendant texted B.H. using the telephone number that he used to contact the aforementioned victims.  At the time, B.H. did not know it was the defendant, but figured out that it was him based on context. They exchanged the following text messages:

DEFENDANT: You still there (timestamped 6/23/2021 10:28:01)

B.H.: No . . . You can leave now. Please don't do this . . . (Timestamped 6/23/2021 10:29:46)

DEFENDANT: I just wanted to make sure you get home ok (Timestamped 6/23/2021 10:30:27)

B.H.: I'm OK thanks (Timestamped 6/23/2021 10:30:45)

DEFENDANT: Well I apologize if it made you uncomfortable. I thought we were having a good time. (Timestamped 6/23/2021 10:32:03)

DEFENDANT: You have my number if you want to use it. I'll erase yours. (Timestamped 6/23/2021 10:32:53)

DEFENDANT: I already left. I'm on another call. (Timestamped 6/23/2021 10:34:27)

In the aftermath of the defendant's conduct, B.H. lives in what she calls "irrational" fear of the defendant.  She is constantly worried that she will see him in the Starbucks she frequents, or that he will be lying in wait for her in the bushes outside of her house. B.H., like all of the defendant's victims, no longer feels safe to live in her community.

### IV.   LEGAL ANALYSIS

Based on the foregoing, a grand jury found probable cause that the defendant committed the crimes charged in the indictment.  Counts One, Two, Four, Five, and Eight are all crimes of violence, and Counts One, Two, Five, and Eight are each punishable up to life in prison, permitting the United States to seek detention, pursuant to 18 U.S.C. § 3142(f)(1)(A) and (B), respectively.  Upon considering the factors set forth below and pursuant 18 U.S.C. § 3142(g), there is clear and convincing evidence that

no condition or combination of conditions will reasonably assure the safety of any other person and the community.  18 U.S.C. § 3142(f); *United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991) (A judicial determination that a defendant should be detained pending trial on the ground of community safety must be supported by clear and convincing evidence.)  The defendant should therefore be detained pending trial.

### A.   <u>Factors Governing Detention</u>

#### 1.   **Nature and Circumstances of the Offenses Charged**

The nature and circumstances of the offense charged support detention.  As set forth above, the defendant's exploitation of his power and position to render the very community he swore to protect unsafe illustrates the egregious nature of his conduct.  Indeed, because he patrolled the streets, no one was safe – not the convenience store worker who sold him iced tea, nor the domestic violence victim who relied on the police to keep her safe, nor the driver whom if he really suspected of driving under the influence should have been so cited or arrested, rather than being a receptacle for the defendant's depravity.  Additionally, the United States also has evidence that the defendant targeted a teenage girl whom the defendant knew battled mental health issues and he also targeted a homeless woman who suffered from drug addiction, as well as another woman who called SPD for help enforcing a custody order.  The defendant's very presence in the community poses a risk to any person and to the community itself, which is why there is no condition or combination of conditions to reasonably assure otherwise. He knew how to get away with his crimes for years, be it by choosing victims whom he thought no one would believe, threatening them into silence, or ensuring there was no physical evidence to corroborate their accounts.

Moreover, considering the nature and circumstances of the offense also requires the Court to weigh the possible penalty the defendant faces upon conviction.  *See United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990).  Indeed, the seriousness of the defendant's crime is reflected in the sentences he faces if convicted. The defendant faces life imprisonment on each of the four charges that allege the aggravated sexual abuse enhancement and attempted aggravated sexual abuse enhancement, and his advisory sentence under the United States Sentencing Guidelines for each of those counts is likewise life in prison.  Moreover, for eight of his ten charges – even where the conduct alleged is only a

16

misdemeanor – the Guidelines recognize the gravity of the conduct because they each start with a base level of 32 and add six levels because the defendant was acting under color of law.  The base offense level for each charge alleging sexual assault is therefore a minimum of 38, which is 235 to 293 months. That means that the recommended sentence for each of the "non-life" counts is the statutory maximum, and the counts will likely "stack," with sentences being imposed consecutively.

### 2.   The Weight of the Evidence Against the Defendant

"The weight of the evidence is the least important factor" when determining whether detention is appropriate, "and the statute neither requires nor permits a pretrial determination of guilt."  *United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991) (internal quotations omitted).  Nonetheless, the pattern of predatory behavior that has emerged favors detention, and the defendant's guilt is overwhelming.  To that point, the defendant should not be under the misimpression that no one will believe the word of his victims, and that it is simply his word against theirs.  "He said/she said" is a fallacy that ignores the law and the rules of evidence.

In addition to aforementioned evidence and how each victim's account corroborates the other, and how their prior consistent statements are likewise admissible to rebut the defense of recent fabrication, Rule 413 of the Federal Rules of Evidence presumes the admissibility of evidence of other sexual assaults to be used for any matter "to which it is relevant," including propensity, when the defendant is charged with a sexual assault.  Fed. R. of Evid. 413.  That is to say that even if the United States does not ultimately seek additionally charges, Rule 413 allows the United States to introduce evidence of uncharged sexual assaults to prove the defendant's propensity to commit sexual assault.

"Fed. R. Evid. 413. . . was passed to make an exception to Fed. R. Evid. 404(b), which imposed a blanket prohibition on propensity evidence."  *Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1268 (9th Cir. 2000) (citing *United States v. LeCompte*, 131 F.3d 767, 769 (8th Cir. 1997)); *United States v. Meacham*, 115 F.3d 1488, 1491 (10th Cir. 1997); *United States v. LeMay*, 260 F.3d l018, 1026 (9th Cir. 2001) (concluding that there is nothing "fundamentally unfair" about the allowance of propensity evidence); *United States v. Redlightning*, 624 F.3d 1090, 1120 (9th Cir. 2010) ("Evidence that tends to show that [a defendant] committed another sexual assault . . . tends to show that [the defendant] had the propensity to commit another sexual assault."); *United States v. Enjady*, 134 F.3d

1427, 1431 (10th Cir.1998); *United States v. Crow Eagle*, 705 F.3d 325 (8th Cir. 2013); *United States v. Guardia*, 135 F.3d 1326, 1330 (10th Cir. 1998) ("[P]ropensity evidence has a unique probative value in sexual assault trials and that such trials often suffer from a lack of any relevant evidence beyond the testimony of the alleged victim and the defendant.").

Likewise, the United States is also aware of evidence that may be admissible under Fed. R. Evid. 404(b) to further establish the defendant's pattern of behavior or to rebut the defense that the victims came on to him – which is what he claimed to the FSO detectives in the wake of being arrested for his conduct toward B.H. Rule 404(b) is considered "an inclusive rule, admitting all evidence of other crimes or acts except [contrary to Rule 413] that which tends to prove only criminal disposition." *United States v. Van Metre*, 150 F. 3d 339, 349 (4th Cir. 1998); *accord United States v. Meling*, 47 F.3d 1546, 1557 (9th Cir. 1995). Taken together, Rules 413 and 404(b) permit the accounts of other women about their interactions with the defendant (and which federal authorities are still investigating). Such evidence underscores the weight of the evidence, further demonstrating the defendant's danger to the community.

For example, S.B. met the defendant in September 2016, not long after he began working for SPD at the end of March 2016, when she, too was working at Fastrip, the convenience store that the defendant frequented while working in his capacity as an SPD officer. Shortly thereafter, the defendant gave S.B. his personal number – the same number that he used to contact his other victims listed in the indictment. They developed what she perceived was a friendship, and throughout their friendship, S.B. disclosed personal aspects about her life, including details about her marriage and when she was prone to self-harm. One evening, on March 17, 2018, when they were both hanging out in the Walmart parking lot, S.B. told the defendant about a particularly egregious incident of cutting. He felt her leg where her scar was, and then pushed her up against her car, groped her breasts and buttocks, and attempted to kiss her, but she moved her head away. After that, she never spoke to him again. When she learned of his arrest in June 2021, she called what she thought was an anonymous tip line to report him, but it was actually an FSO sergeant's direct line. Losing her nerve, she hung up rather than leaving a message. The next day, the sergeant saw the missed call and called her back, and she agreed to be interviewed.

According to S.B., the defendant also texted her sexually "inappropriate" texts. On one occasion, the defendant took S.B.'s mobile phone and began scrolling through her photos, then located a picture displaying S.B. topless and sent it to his own phone, all without consent. Significantly, the defendant was not acting in his capacity as a police officer when he sexually assaulted S.B., undercutting any argument by the defendant that he is no longer a threat the community because he is not employed by SPD. Instead, this highlights the weight of the evidence against him.

### 3.     The History and Characteristics of the Defendant

The United States expects that the defendant will argue for release because he has no criminal history and is no longer employed as a law enforcement officer. As demonstrated by the charges in the indictment and the aforementioned sexual assault of S.B., neither argument is persuasive. First, although the defendant's conduct came to light in 2021, he was not caught the first time he committed sexual assault. He had been violating the constitutional rights of the women in Sanger for the five years that he worked there, engaging in a pattern of conduct that ranged from gratuitous searches and photographs to forcible rape. Both the federal and local authorities did not fully appreciate the breadth and depth of his criminal conduct until the investigation into B.H.'s allegations were well underway. The defendant's success in evading detection is not a reason to let him out. If anything, it is a reason to detain him.

If this Court were to determine the defendant's law-abidingness based solely on past convictions, then he of course appears to be law-abiding, aside from traffic tickets and failures to appear at those hearings. But as the facts and evidence bear out, he is anything but law-abiding. In short, it appears that he is a serial rapist who, according to virtually every female with whom the defendant made contact and whom the authorities have since interviewed, he either somewhat scared them or downright terrified them – and he often sexually assaulted them or otherwise engaged in some form of sexual misconduct.

To that end, in addition to the aforementioned allegations, the United States is also investigating allegations of other women who alleged the defendant forced them to perform oral sex, vaginally raped them, groped their breasts, sent inappropriate texts, or simply scared them when he responded to their homes when they needed help. One woman said that the defendant made the hair on the back of her neck stand up, and she was grateful her eight=year old daughter was in the next room when the

defendant came to her house.  Another domestic violence victim relayed that the defendant made inappropriate comments about her "sexy" appearance and told her that he could "understand why [she] drove her husband crazy."

And, the defendant's inappropriate behavior did not go unnoticed by his SPD colleagues.  His female colleagues not only were on the receiving end of inappropriate comments, but they witnessed the defendant engage in gratuitous and inappropriate searches of female arrestees, all of which are the subject of additional investigation.  His male colleagues heard him make inappropriate comments, and one colleague went so far as to say that he suspected the defendant was a predator.

### 4.   The Nature and Seriousness of the Danger to Any Person or the Community

One of the final factors for this Court to consider is the nature and seriousness of the danger to any person or the community.  The victims feared that the defendant would terrorize them because he in fact did.  Often, once a perpetrator is arrested or facing charges, authorities can reasonably assure a crime victim that she is safe from her attacker, perhaps because she is living in another state or because he has no way to access where she is.  Indeed, the United States will make every effort to ensure the safety of these victims and would like to presume that the defendant is smart enough not to risk witness tampering charges.  Nonetheless, his pool of victims has been wide and varied, allegedly even targeting women after consensual relationships soured.

While the defendant may argue he would not continue such behavior now that he has been caught, that did not prove to be true after S.L. reported him to SPD. If anything, he appears to have been emboldened by his lack of accountability.  After FSO arrested him for his sexual assault of B.H., the defendant gave a post-Miranda statement riddled with inconsistencies and falsehoods, perhaps in hopes of talking himself out of local state charges. Thereafter, the state authorities deferred to federal authorities, but to the defendant, his efforts appears successful, and this was just another instance where skirted responsibility. There is therefore no indication that the defendant has been deterred.  Because of that, the only way to assure community safety is detention.

### B.   The Defendant's Risk of Flight

A judicial determination that a defendant is a risk of flight pursuant to 18 U.S.C. § 3142 (f)(2)(A), must be supported by a preponderance of the evidence. *United States v. Motamedi*, 767 F.2d 1403, 1406

(9th Cir. 1985). While the crux of the United States' argument for detention is that the defendant is a danger to the community, it is worth noting that the gravity of his charges and the penalties that the defendant faces create a flight risk.  Any former law enforcement officer who faces the prospect of life in prison for multiple sexual assaults is a flight risk, and it does not inure in his favor that the defendant has failed to appear in other judicial proceedings, albeit for traffic offenses.

The argument that the defendant turned himself in on the current charges only goes so far because there is no way he could have known the gravity of the charges he was about to face, the evidence against him, and the number of victims who have come forward.  Indeed, the landscape has changed for him not only from when FSO arrested him in June 2021, but from when he arrived at the federal courthouse just days ago.  That in and of itself establishes by a preponderance of the evidence that the defendant is a flight risk.

## V.   <u>CONCLUSION</u>

Based on the nature of the charges contained in the indictment, the weight of the proffered evidence against the defendant, and the defendant's danger to the community, it is evident that at this stage in the proceedings no condition or combination of conditions will reasonably assure the appearance of defendant at trial and the safety of the community.

Under the factors set forth in 18 U.S.C. § 3142(g), the United States has demonstrated by clear and convincing evidence that the defendant should be detained pending trial on the ground of community safety. Moreover, there is a preponderance of the evidence that the defendant is a flight risk given the significant amount of prison time he faces if convicted.

For the foregoing reasons, the United States requests that the Court order the pre-trial detention of the defendant.

///

///

///

///

1   ///

2

3   ///

    Dated:  August 8, 2022                          PHILLIP A. TALBERT
4                                                    United States Attorney

5
                                          By:  /s/ KAREN A. ESCOBAR
6                                             KAREN A. ESCOBAR
                                              Assistant United States Attorney
7
                                              KRISTEN CLARKE
8                                             Assistant Attorney General

9
                                              /s/ FARA GOLD
10                                            FARA GOLD
                                              Special Litigation Counsel
11                                            Civil Rights Division, Criminal Section
                                              U.S. Department of Justice
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28